**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

MARVA MICHELLE COURTNEY,      )
                                 )
            Plaintiff,      )
                                 )
            v.              )        1:09CV680
                                 )
NORTH CAROLINA DEPARTMENT OF  )
TRANSPORTATION, "NCDOT," and NORTH )
CAROLINA DIVISION OF MOTOR    )
VEHICLES, "NCDMV,"            )
                                 )
            Defendants.     )

## MEMORANDUM OPINION, ORDER, AND
## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

This case comes before the undersigned United States Magistrate Judge for a recommended ruling on Defendants' Motion for Summary Judgment (Docket Entry 21), as well as for disposition of related motions to strike filed by each side (Docket Entries 27, 30). (<u>See</u> Docket Entry dated Sept. 24, 2010.) For the reasons that follow, the motions to strike will be denied and Defendants' summary judgment motion should be granted.

PROCEDURAL BACKGROUND

Plaintiff's Complaint

One of the initial paragraphs of Plaintiff's Complaint indicates that the action seeks "to enforce rights and remedies secured to Plaintiff by <u>Title VII</u> of the Civil Rights Act of 1964, 42 USC § 2000e et. seq. as amended and as amended by the Civil Rights Act of 1991; <u>and</u> <u>42 USC § 1983</u>" and to have "declar[ed] illegal the acts of Defendants complained herein in violation of rights secured to plaintiff by the <u>several Civil Rights Acts and the Constitution</u>." (Docket Entry 1 at 1-2 (emphasis added).)

Throughout its body, the Complaint appears to identify the following claims:

1) Defendants "acted under color of state and local laws by denying the Plaintiff her <u>constitutional</u> right to work in an environment free from <u>race and gender discrimination</u>, and <u>disparate treatment</u> pursuant to and guaranteed by the <u>Fourteenth Amendment to the United States Constitution in violation of 42 USC § 1983</u>" (<u>id.</u> at 3 (emphasis added));

2) Defendants "subjected [Plaintiff] to <u>disparate treatment due to her race and gender</u>, in terms of the work conditions, privileges, benefits, and work environment . . . [and violated] <u>Title VII</u> [by subjecting Plaintiff to] <u>disparate treatment, discrimination and wrongful discharge</u>" (<u>id.</u> (emphasis added);

3) "Beginning in approximately November, 2008, the Plaintiff was routinely subjected to <u>sexual harassment</u> by her then supervisor, [Captain] Norman Blake" (<u>id.</u> at 4 (emphasis added));

4) "Blake <u>scrutinized [Plaintiff's] work</u> and the manner in which she supervised her staff <u>differently and harsher than he scrutinized the Plaintiff's male coworkers</u> . . . [and] <u>issued discipline to her</u> for minor and unsubstantiated infractions, <u>but overlooked similar conduct by the Plaintiff's male co-workers</u>" (<u>id.</u> (emphasis added));

5) "in February, 2009, [Plaintiff] complained to [Defendants] about the sexually harassing conduct by Blake . . ., no one ever did investigate her complaints . . . [, and,] [s]hortly thereafter, on or about March 20, 2009, the Plaintiff was <u>transferred</u> from the

Guilford County, Greensboro office to the Forsyth County, Winston-Salem office, while Blake continued to work at the previous location . . . caus[ing] the Plaintiff to incur greater costs and travel time associated with getting to and from work" (id. (emphasis added)), which action constituted "retaliation for her engaging in said protected activity [of opposing gender discrimination]" (id. at 5 (emphasis added));

6) "in April 2009, [Plaintiff] inadvertently left her state issued weapon unsecured in a training classroom . . . [and] was placed on a three-day suspension without pay . . . [while] Caucasian male co-workers have committed the same or similar offense, but did not receive discipline for such actions" (id. (emphasis added));

7) Defendants' foregoing suspension of Plaintiff constituted "unwarranted discipline to her in retaliation for her engaging in said protected activity" (id. (emphasis added)); and

8) "Plaintiff was terminated in July, 2009 allegedly for unsatisfactory job performance and unacceptable personal conduct . . . [but in reality] in retaliation for engaging in the aforementioned protected activity" (id.) and "because of her gender and race discrimination" (id. at 6 (emphasis added)).

At its conclusion, the Complaint describes Plaintiff's claims as follows:

> COUNT ONE
> The Defendants are liable to the Plaintiff for retaliating against her in violation of Title VII for opposing practices made unlawful pursuant to Title VII of the Civil Rights Act of 1964, and as amended in 1991.

-3-

COUNT TWO

The Defendants are liable to the Plaintiff for <u>wrongful termination due to gender discrimination and for subjecting her to sexual harassment</u>, including a Hostile Work Environment, and for <u>disparate treatment</u> in the terms and conditions of her employment in violation of <u>NCGS § 143-422.2</u>, <u>Title VII</u> and <u>42 USC §1981</u>.

COUNT THREE

The Defendants are liable to the Plaintiff for <u>race discrimination</u> in violation of <u>Title VII</u> of the Civil Rights Act of 1964, and as amended in 1991, and <u>42 USC §1983</u>.

(<u>Id.</u> at 7 (emphasis added).)

According to the Complaint:

All conditions precedent to jurisdiction under 42 USC § 2000e-5(f)(3) have occurred or been complied with, to wit:

- On or about March 24, 2009, Plaintiff timely submitted a charge of discrimination on the basis of retaliation, and sex discrimination to the Equal Employment Opportunity Commission ("EEOC"). Said Charge # is 433-2009-01187. Thereafter, on April 22, 2009, the Plaintiff amended said charge of discrimination to include a claim of race discrimination.

- On or about June 2, 2009, the Department of Justice mailed the Plaintiff a "notice of right to sue letter" related to Charge #: 433-2009-01187.

(<u>Id.</u> at 2.)

<u>Defendants' Answer</u>

In their Answer, Defendants asserted, inter alia, that "Plaintiff's right to sue letter and EEOC charge cover only allegations relating to harassment by her supervisor and her eventual transfer to a different duty station. As reflected in the Plaintiff's charge, the specific events of which she complains took place no later than March 24, 2009." (Docket Entry 10 at 7.)

Defendants also responded that they "are not persons within the meaning of 42 U.S.C. § 1983 and § 1981 for the purposes of recovering monetary damages" and that "[n]o general or punitive damages may be had against the Defendants under any of the legal theories in the Complaint under 42 USC § 1983." (<u>Id.</u> at 6.)

The Parties' Summary Judgment Filings

After the completion of discovery, Defendants moved for summary judgment "on the grounds that there is no genuine issue as to any material fact and Defendants . . . are entitled to judgment as a matter of law." (Docket Entry 21 at 1.) In support of said summary judgment motion, Defendants filed a brief to which they attached a number of affidavits and other exhibits. (Docket Entry 22.) Those exhibits included a copy of the amended EEOC charge Plaintiff submitted on or about April 22, 2009. (<u>Id.</u> at Ex. N.) Under the heading for "DISCRIMINATION BASED ON," said form bears check-marks in the boxes for "RACE," "SEX," "RETALIATION," and "OTHER" ("[s]pecif[ied]" as "Intentional harassment"). (<u>Id.</u>) Under the heading for "DATES DISCRIMINATION TOOK PLACE," the form lists "10-17-2008" below the sub-heading "Earliest" and "03-24-2009" below the sub-heading "Latest." (<u>Id.</u>)[1]

Under the heading "THE PARTICULARS ARE," said form contains the following information:

I. Starting in November 2008, I became the victim of <u>Harassment and Sexual Harassment</u> on the part of Norman J. Blake District Supervisor. Ever since Mr. Blake's

---

[1] The box for "CONTINUING ACTION" in that section also bears a check-mark. (Docket Entry 22 at Ex. N.)

arrival, I have been the victim of <u>sexual harassment and intentional harassment</u>. For example, Mr. Blake always glares at my buttocks and grins; Mr. Blake looks at me as to undress me with his eyes; Mr. Blake has stared at my chest and when I placed my arms across my chest he asked me about five (5) times to sit-up. I have also been the victim of <u>differential treatment</u> under Mr. Blake. <u>Specifically, Mr. Blake scrutinizes my work and the manner in which I manage/supervise those under my supervision. However, Mr. Blake does not scrutinize the work and/or manner of supervision of my male coworkers.</u> Moreover, Mr. Blake has also given me bogus write-ups that even he can not explain.

II. When I complained to Deborah Brewer, Deputy Director and GF Butler, Assistant Director; Deputy Director Brewer told me that they needed to do something because I did not need to be going to work sick, loosing [sic] weight, being stressed out, etc. She went on to state that she had a supervisor like Mr. Blake and she had been through what I was going through. However, <u>on March 20, 2009, I learned that I was being transferred to another district and the harasser, Mr. Blake, was being allowed to return to his job</u>.

III. I believe that I am being <u>retaliated</u> against because I complained of issues that are unlawful. I believe that I was <u>discriminated against because of my gender, female, and race, African American</u> in violation of Title VII of the Civil Rights Act of 1964, as amended.

(<u>Id.</u> (emphasis added).)[2]

In their summary judgment brief, Defendants, inter alia, relied on this record material to support the following arguments:

1) "[b]ecause Plaintiff did not file a separate [EEOC] Charge with regard to her <u>three day suspension</u> [in April 2009 for leaving her firearm unsecured], and since the time for doing [sic] expired at the latest on 31 January 2010, her claim should not be considered by this Court" (<u>id.</u> at 15 (emphasis added)); and

_____

[2] Those factual allegations mirror the factual allegations in Plaintiff's EEOC charge filed on March 24, 2009. (<u>See</u> Docket Entry 25-4 at 2.)

2) "[b]ecause Plaintiff did not file a separate [EEOC] Charge with regard to her termination [on July 16, 2009], and since the time for doing so expired at the latest on 18 May 2010, Plaintiff's [sic] has failed to state an actionable claim upon which relief can be granted" (id. at 16 (emphasis added)).

Plaintiff filed a response in opposition to Defendants' summary judgment motion to which she attached a number of exhibits. (Docket Entries 25, 25-2, 25-3, 25-4, 25-5.) Those exhibits included a copy of the amended EEOC charge she submitted on or about April 22, 2009, that matched the copy of said document Defendants attached to their summary judgment brief. (Compare Docket Entry 25-4 at 2 with Docket Entry 22 at Ex. N.) Plaintiff also filed a brief with additional attachments, including an affidavit from Plaintiff. (Docket Entry 26-2 at 1-9.) In that brief, "[P]laintiff admit[ted] that the only allegations raised in her EEOC charge of discrimination, even as amended, pertain solely to sexual harassment and retaliation based on complaining about sexual harassment." (Docket Entry 26 at 15.)[3]

<u>Additional Motions</u>

In addition, Plaintiff filed a Motion to Strike Portions of the Affidavits of Norman J. Blake, Graham F. Butler, Ronald G. Kaylor and Rena Rikard (which affidavits Defendants had attached to their summary judgment brief). (Docket Entry 27.) Defendants

---

[3] In this respect, Plaintiff conceded more than the record required in that (as noted above) the EEOC charge also included allegations of sex discrimination via disparate treatment by Captain Blake. (See Docket Entry 22 at Ex. N.)

responded in opposition to Plaintiff's foregoing motion (Docket Entry 29), and filed their own Motion to Strike Portions of the Affidavit of the Plaintiff (Docket Entry 30), to which Plaintiff responded in opposition (Docket Entry 31).

## Identification of Plaintiff's Claims

As set out above, the Complaint fails to make clear which of the various legal provisions cited therein relate to the various acts allegedly committed by Defendants. In other words, the Complaint does not set out claims predicated on particular factual allegations <u>and</u> particular statutes. Instead, at its beginning and its end, the Complaint invokes Sections 1981 and 1983, Title VII, and a state statute, but without ties to specific factual allegations.[4] By contrast, the middle portion of the Complaint contains a variety of factual allegations, but (with one exception) fails to link those matters to particular legal provisions.

The resulting ambiguity complicates the analysis of which, if any, of Plaintiff's claims can proceed beyond summary judgment, particularly given that the statutory provisions cited in the

---

[4] Moreover, some of the Complaint's statutory references appear internally inconsistent or incorrect. For example, under the heading "Count Two," the Complaint seems to target sex-based discrimination (including in the form of harassment/hostile work environment), but invokes not only Title VII and a state statute, but also Section 1981, which applies only to racial discrimination, <u>see</u> <u>Aleman v. Chugach Support Servs., Inc.</u>, 485 F.3d 206, 212 (4th Cir. 2007); at the same time, under the immediately-following heading "Count Three," the Complaint identifies "race discrimination" as the claim, but omits any reference to Section 1981 and, instead, cites Title VII and Section 1983. (Docket Entry 1 at 7.) At an earlier point, however, the Complaint expresses an intent to proceed under Section 1983 based on both "race and gender discrimination." (<u>Id.</u> at 3.)

Complaint have specific requirements and/or restrictions that impact the availability of relief; notably:

1) a plaintiff generally can proceed under Title VII only on matters as to which she exhausted administrative remedies, <u>see</u> <u>Jones v. Calvert Group, Ltd.</u>, 551 F.3d 297, 300 (4th Cir. 2009) ("Only those discrimination claims stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint may be maintained in a subsequent Title VII lawsuit. . . . [A] failure by the plaintiff to exhaust administrative remedies concerning a Title VII claim deprives the federal courts of subject matter jurisdiction over the claim." (internal quotation marks omitted));

2) a plaintiff cannot proceed against a state agency under Section 1983, <u>see</u> <u>Bennett v. North Carolina Dep't of Transp.</u>, No. 1:05CV764, 2007 WL 4208390, at *4 (M.D.N.C. Nov. 26, 2007) (unpublished) (Beaty, C.J.) (citing <u>Will v. Michigan Dep't of State Police</u>, 491 U.S. 58, 71 (1989), in dismissing "Plaintiff's § 1983 claims for racial discrimination and hostile work environment against [NCDOT]" because said state agency fails to qualify as a "person" within the meaning of Section 1983);

3) Section 1981 does not provide a cause of action, independent of Section 1983, against a state agency, <u>see</u> <u>Dennis v. County of Fairfax</u>, 55 F.3d 151, 156 (4th Cir. 1995) ("[W]hen suit is brought against a state actor, § 1983 is the 'exclusive federal remedy for violation of the rights guaranteed in § 1981.'" (quoting

<u>Jett v. Dallas Indep. Sch. Dist.</u>, 491 U.S. 701, 733, 735-36 (1989))); and

4) the Eleventh Amendment of the United States Constitution generally bars a plaintiff from pursuing in this Court claims under Sections 1981 and 1983 or state law against a state agency, <u>see South Carolina State Bd. of Dentistry v. Federal Trade Comm'n</u>, 455 F.3d 436, 446 n.8 (4th Cir. 2006) ("The Eleventh Amendment technically bars a person from suing a state or its agency to seek injunctive relief."); <u>Brown v. North Carolina Division of Motor Vehicles</u>, 166 F.3d 698, 705 (4th Cir. 1999) (ruling that NCDMV (and thus, by logical extension, its overarching department, NCDOT) constitute state agencies imbued with immunity under the Eleventh Amendment); <u>Huang v. Board of Governors of Univ. of N.C.</u>, 902 F.2d 1134, 1138 (4th Cir. 1990) ("[T]he Eleventh Amendment bars the pendent state monetary damage claims as well as the § 1981 and § 1983 damage claims [against the defendant-state agency]."). [5]

In their respective summary judgment filings, the parties addressed the first of the foregoing matters (i.e., Title VII's exhaustion requirement), but they failed to discuss the other above-cited issues (i.e., the "persons" limitation of Section 1983, the fact that Section 1981 provides no basis independent of Section 1983 to proceed against state entities, and Eleventh Amendment immunity). As a result, in the interest of judicial economy

---

[5] In contrast, "the Supreme Court has held that in enacting Title VII, Congress properly abrogated the states' Eleventh Amendment immunity for such suits." <u>Ellis v. North Carolina</u>, 50 Fed. Appx. 180, 180 (4th Cir. 2002) (citing <u>Fitzpatrick v. Bitzer</u>, 427 U.S. 445, 456-57 (1976)).

(particularly as reflected by authority from the United States Court of Appeals for the Fourth Circuit declaring that, "because of its jurisdictional nature, a court ought to consider the issue of Eleventh Amendment immunity at any time, <u>even sua sponte</u>," <u>Suarez Corp. Indus. v. McGraw</u>, 125 F.3d 222, 227 (4th Cir. 1997) (emphasis added)), the Court ordered supplemental briefing as to the viability of any claim asserted by Plaintiff under Sections 1981 and 1983, as well as state law. (Docket Entry 32.)

In her supplemental brief, Plaintiff stated that she "does not assert a claim against the defendants under 42 USC §1981 or §1983. Any reference to these statutes in the complaint should be disregarded." (Docket Entry 34 at 1.) Said brief did not address the matter of any state law, employment discrimination claim (<u>see id.</u>); however, in light of the authority cited above, the Court should conclude that the Eleventh Amendment would bar any such claim. Accordingly, Title VII represents the only possible vehicle for Plaintiff's instant causes of action against Defendants.

Having determined that only Title VII provides a potentially-viable legal basis for the claims in the Complaint, the task of identifying the precise contours of those claims remains. Based on the language of the Complaint quoted above, it appears that Plaintiff has alleged the following causes of action:

1) sex-based discrimination in the form of a hostile work environment based on the conduct of Captain Blake during the period from August 2008 through March 2009;

2) sex- and race-based discrimination in the form of disparate treatment by Captain Blake in supervising her during the period from August 2008 through March 2009;

3) retaliation in the form of her transfer from the Greensboro office to the Winston-Salem office on March 20, 2009;

4) sex- and race-based discrimination in the form of her three-day suspension on April 2, 2009, and her firing on July 16, 2009; and

5) retaliation in the form of her three-day suspension on April 2, 2009, and her firing on July 16, 2009.

## FACTUAL BACKGROUND[6]

### Plaintiff's Interactions with Captain Blake

Plaintiff began working for Defendants in October 2006, when then-Director of Defendant NCDMV's License and Theft Bureau, John Robinson, hired her as a Lieutenant/Assistant Supervisor in Greensboro. (Docket Entry 26-2 at 1.) At that time, Captain Timothy Collins supervised Plaintiff. (Id.) According to Captain Collins, after Plaintiff's hiring, he "met with . . . Director Robinson and asked him how to manage an Assistant Supervisor who knew absolutely nothing about the job of being an Inspector [i.e., the position held by those persons Plaintiff had to oversee]." (Docket Entry 22 at Collins Aff., ¶ 3.)[7] In Plaintiff's presence,

---

[6] Consistent with the authority in the Discussion section below, the recited facts reflect the evidence in the light most favorable to Plaintiff.

[7] Director Robinson hired Plaintiff over "[m]any other candidates . . . who had practical working knowledge of the job through their many years of service
(continued...)

"Director Robinson told [Captain Collins] to 'make the best of
it.'" (Id.)[8] "As a result, [Captain Collins] did not attempt to
supervise [Plaintiff] as [he] normally would an Assistant
Supervisor.  [He] believed [he] would get in trouble with
[Director] Robinson or others if [he] held [Plaintiff] to the
normal standard of an Assistant Supervisor." (Id. at Collins Aff.,
¶ 4.)  Captain Collins and Director Robinson retired in June 2008.
(Id. at Collins Aff., ¶¶ 1, 6.)  Plaintiff received good
performance evaluations and no disciplinary sanctions during the
period between her hiring in October 2006 and Captain Blake's
arrival as her supervisor in August 2008.  (Id. at 1-2.)

In an affidavit, Plaintiff described these specific,
interactions she had with Captain Blake:

1) "[o]n October 16, 2008, [Plaintiff] noticed that on several
occasions after ending a conversation with Blake and other
subordinates, the subordinates would look at Blake and laugh as
[Plaintiff] walked away" (id. at 2);[9]

2) "[i]n November 2008, Captain Blake stated to [Plaintiff]
. . . that [she] remind[ed] him of one of his ex-wives" (id.);

---

[7](...continued)
with the License and Theft Bureau."  (Docket Entry 22 at Collins Aff., ¶ 2.)

[8] In her affidavit, Plaintiff did not dispute Captain Collins's account of
this conversation.  (See Docket Entry 26-2.)

[9] According to Plaintiff, she "was told that Blake often watched [her] rear
end as [she] walked away from him at the conclusion of conversations with him."
(Docket Entry 26-2 at 2.)  Plaintiff neither has identified who "told" her this
information, nor any other evidence on point.  (See id.; Docket Entry 26 at 2.)

3) "Blake also stated that females generally do not have their heads on straight, and that only one of his daughters had her head on straight" (id.);

4) "Blake constantly sent [Plaintiff's] approved investigations back to [her] with red written sticky notes attached for corrections . . ., [which] were mostly for minor spelling errors or for subjective reasons" (id. at 2-3);

5) "Blake would leave the office and intentionally not return to the office until late, causing [Plaintiff] to have to stay at the office through [her] lunch period" (id. at 3);

6) "Blake also made negative comments about females in authority, including Barbara Webb, about whom he stated that he didn't understand why she had so much power and why the DMV needed to go to her for License and Theft information[, and] Marge Howell, another ranking female, [who he said] didn't know what she was doing" (id.);

7) Captain Blake "often emailed [Plaintiff] task [sic] to complete that where [sic] sent to him for completion by headquarters . . . [and] asked [Plaintiff] to show him how to complete task [sic]" (id.);

8) on November 4, 2008, after Plaintiff "verbally informed Blake that [she] was offended by the comments he made and that [she] felt harassed by him, . . . he retaliated against [her] by 'counseling [her]'" (id.), specifically, that she needed to improve

in the areas of "Professional Leadership," "Effective Communications," and "Teamwork" (Docket Entry 25-2 at 3);[10]

9) "[o]n February 11, 2009, Blake and [Plaintiff] were having a conversation in Blake's office when Blake told [Plaintiff] to sit up while [she] was sitting in the chair in front of his desk . . . [with her] legs crossed and [her] arms . . . folded over [her] chest area because Blake was staring at [her] breasts" (Docket Entry 26-2 at 4); and

10) Captain Blake "requested that [Plaintiff] remove a disciplinary document from [the file of] . . . a white male [subordinate], whom [Plaintiff] was attempting to discipline for a company violation" (id.).[11]

In addition, Plaintiff incorporated into her affidavit a document she previously provided to Defendants. (Id.) Matters in that document concerning Captain Blake not otherwise covered in Plaintiff's affidavit consisted of:

1) on October 8, 2008, after a meeting, Captain Blake "told [Plaintiff] to 'just calm down [you] get to [sic] hyped' . . . and said to [her] several times since this meeting to 'just calm down' while [she] was talking to [her] subordinates and customers" (id. at 15);

---

[10] Plaintiff also averred that, following her complaint to Captain Blake, he "seemed to get worse and make more demeaning comments." (Docket Entry 26-2 at 3.) However, Plaintiff offered no concrete examples. (See id.)

[11] According to Plaintiff, "[t]here were other instances similar to this type of instance where Blake undermined [her] authority," but she gave no further examples. (Docket Entry 26-2 at 4.)

2) on November 6, 2008, Captain Blake interpreted an administrative regulation regarding use of personal vehicles in a manner different from her prior supervisors (<u>id.</u> at 17);

3) in early November 2008, Plaintiff learned that Captain Blake had told a secretary to call only him (and thus, by implication, not Plaintiff), if the number of customers seeking assistance regarding emission matters became so large that "there was help needed" (<u>id.</u> at 17-18);

4) on November 7, 2008, after previously approving Plaintiff's request to leave work at noon, Captain Blake gave her an assignment that required her to work until 2:55 p.m. (<u>id.</u> at 18);

5) on November 17, 2008, Captain Blake told Plaintiff that he was not concerned about the performance of a male Lieutenant because said Lieutenant "had his stuff together," but that Captain Blake "needed to work with [Plaintiff]" (<u>id.</u>);

6) on December 11, 2008, Captain Blake asked Plaintiff and an Inspector about "tension" he perceived between them in a manner Plaintiff perceived as an attempt "to stir up trouble" because she and said Inspector "had some personnel issues in the past," including that said Inspector "had not received a promotion . . . [when Plaintiff] was on the interview panel" (<u>id.</u> at 19);

7) on December 11, 2008, Plaintiff "noticed Captain Blake ogling at [her] as [she] walked away" (<u>id.</u>);

8) on December 11, 2008, "while he was standing in a cubicle talking with an inspector, Captain Blake made comments while

[Plaintiff] was talking to a co-worker about the kind of women he likes . . . ([i.e.,] [y]oung women and long legged women)" (id.);

9) on January 15, 2009, Captain Blake told Plaintiff she "would need to be examined by a medical officer for [Defendants] before [she] could start limited duty" following a surgical procedure and "[f]rom [her] understanding of policy and procedure [that] was incorrect" (id. at 20);

10) on February 9, 2009, Captain Blake "sent [Plaintiff] an email telling [her] to send him [her] schedule on a day to day basis," whereas she believed that Captain Blake allowed a male Lieutenant to send an email at the beginning of a week setting out his schedule for the whole week (id. at 20-21);

11) on February 11 and 12, 2009, Captain Blake let Inspectors "go to Raleigh without advising [Plaintiff]" (id. at 22);

12) on February 16, 2009, Captain Blake counseled Plaintiff about her alleged failure to follow certain procedures under circumstances she deemed unwarranted (id. at 21); and

13) on February 26, 2009, Captain Blake made changes to Plaintiff's proposed personnel schedule, but not to the proposal submitted by a male Lieutenant (id. at 22).

Plaintiff's Internal Complaint and Defendants' Response

"[O]n February 27, 2009, [Plaintiff] made a formal complaint to [a supervisory employee of Defendants] . . . advising her of workplace harassment and sexual harassment." (Id. at 4.) At that time, Plaintiff "requested to be moved out of the Greensboro office until this issue was resolved . . . [and] further stated that [she]

would feel uncomfortable at the Greensboro office working under Captain Blake's supervision." (Id. at 22 (emphasis added).) "On March 3, 2009[, Plaintiff] filed a formal complaint in writing to [a supervisory employee of Defendants] in reference to hostile work environment." (Id. at 4.) That same day, Defendants, through the then-Director of the License and Theft Bureau, Brian Bozard, sent Plaintiff a letter "ackowledg[ing] receipt of [her] complaint against [Captain] Blake . . . [and stating that they were] initiating an investigation into [her] complaint." (Id. at 23.)

Defendant NCDMV's Office of Professional Standards ("OPS") investigated Plaintiff's sexual harassment complaint against Captain Blake (including by interviewing 13 employees from the Greensboro office, as well as Plaintiff and Captain Blake); thereafter, on March 19, 2009, OPS adjudged Plaintiff's allegations unfounded. (See Docket Entry 22 at Troxler Aff. and Ex. D.)[12] "While the allegations of sexual harassment against [Captain Blake] were investigated, [he] was transferred to Raleigh . . .[, but,

_____

[12] In her affidavit, Plaintiff asserted that she "believe[d] that no one at DMV investigated [her] complaints regarding sexual harassment." (Docket Entry 26-2 at 5.) Plaintiff acknowledged that "[t]here was an internal investigation conducted at [her] office," but contended that, during said investigation, her "co-workers were encouraged to complain about [her] work ethic and supervisory skills rather than DMV really addressing the sexual harassment allegations." (Id. at 5-6.) Plaintiff does not identify any evidentiary support for her "belie[f]" that Defendants failed to investigate her allegations or for her assertion that others "were encouraged to complain" about her. (See id.) Defendants moved to strike those portions of Plaintiff's affidavit as unsupported, conclusory statements as to which she lacked personal knowledge. (Docket Entry 30 at 5-6.) In her response to that motion, Plaintiff mistakenly claimed that all of her statements to which Defendants objected related to interactions she had with Captain Blake and failed to identify a basis for her asserted belief that Defendants made no investigation of her allegations and instead encouraged others to complain about her. (See Docket Entry 31 at 1-2.)

after he] was exonerated by the investigation[, he was] returned to [Greensboro]." (<u>Id.</u> at Blake Aff., ¶ 17.)

On March 20, 2009, Michael Robertson, the Commissioner of Defendant NCDMV, "was contacted by [North Carolina State] Senator Katie Dorsett's office regarding [Plaintiff]. Senator Dorsett's assistant stated that [Plaintiff] was afraid to go to the Greensboro office on Monday morning because she heard that Captain Blake also would be there." (<u>Id.</u> at Robertson Aff., ¶ 2.) Commissioner Robertson "contacted the License and Theft Bureau and recommended that [Plaintiff] be temporarily transferred out from under the supervision of [Captain] Blake." (<u>Id.</u> at Robertson Aff., ¶ 5.) That same day, then-Director Bozard "horizontally transferred [Plaintiff] into [a parallel position] at the Winston-Salem District V Office." (Docket Entry 26-2 at 24.) "During her transfer, Plaintiff continued to drive to work in her state car and she remained in the same job classification and paygrade, earned the same salary and accrued the same benefits." (Docket Entry 22 at Butler Aff., ¶ 9.) On March 24, 2009, Plaintiff filed her initial EEOC charge. (Docket Entry 25-4 at 2.)

<u>Plaintiff's Three-Day Suspension</u>

"On March 26, 2009[, Plaintiff] attended an in-service firearms instruction course with several of [her] co-workers. The class was held at Randolph Triad Training Center and was attended

by law enforcement personnel." (Docket Entry 26-2 at 5.)[13] "[Plaintiff] inadvertently left [her] weapon on the desk in the classroom, but immediately returned after a short break." (Id.)[14] "[I]nstructors realized that [Plaintiff's handgun] had been left unattended in the classroom . . . [and] secured the weapon at the front of the classroom until the break was over and the students began to return." (Docket Entry 22 at Butler Aff., ¶ 10.) "The instructors returned the gun to [Plaintiff] and explained to her that it was against policy/range rules (Range Rule #5 which she had just reviewed and signed) to leave a weapon unattended." (Id. at Butler Aff., ¶ 11; see also id. at Ex. G.)

Based on this incident, on April 2, 2009, then-Director Bozard suspended Plaintiff without pay for three days for violating an administrative directive prohibiting "'grossly inefficient job performance,'" more specifically, an "'act or failure to act that . . . creates conditions that increase the chance for death or serious bodily injury to one or more employee(s) or to members of the public . . . .'" (Docket Entry 26-2 at 25.) According to Plaintiff, "[o]n March 25, 2009, [three Inspectors] left their

---

[13] Plaintiff averred that "[n]o one other than law enforcement was in the building," but provided no basis to infer that she had personal knowledge of said matter. (Docket Entry 26-2 at 5.) Defendants moved to strike that portion of her affidavit. (Docket Entry 30 at 5.) In her response, Plaintiff mistakenly asserted that all of her statements to which Defendants objected related to interactions she had with Captain Blake and failed to show how she had personal knowledge of all the building's occupants. (See Docket Entry 31 at 1-2.)

[14] In her affidavit, Plaintiff asserted that "[n]o one was in the classroom other than DMV instructors at the time," but failed to explain how she had personal knowledge of who was present in her absence. (Docket Entry 26-2 at 5.)

shotguns propped against their desk while they took a class break."
(Id. at 5.)  Plaintiff also described an incident "in March 2009,
[when a Captain] left his shotgun grounded on the firing range and
one of the female instructors found it."  (Id.)  Plaintiff,
however, failed to note the discipline (or lack thereof) said
individuals received.  (See id.)[15]  Conversely, Defendants presented
evidence that "Plaintiff's three day suspension was the same form
of discipline imposed on other sworn officers employed by the
License and Theft Bureau who leave their weapon unattended and
there have been others."  (Docket Entry 22 at Butler Aff., ¶ 12.)

### Events Leading up to Plaintiff's Firing

"On April 16, 2009, [Plaintiff] locked the keys to her patrol
vehicle inside the vehicle . . . [and] did not arrive at [her]
Office until 9:45, 1 hour and 45 minutes after her shift was set to
begin.  However, [Plaintiff] submitted a time sheet indicating that
she had worked an eight hour day."  (Id. at Rikard Aff., ¶ 6.)
Defendants' policies provide that employees who "'falsify
information on any report may face disciplinary action up to and

---

[15] In addition, although Plaintiff stated that another Lieutenant's "gun
was stolen from his police vehicle in November 2009 and there was no discipline
administered," she failed to explain how she had personal knowledge of any lack
of discipline received by said individual (particularly given that her employment
ended in June 2009).  (Docket Entry 26-2 at 5.)  Plaintiff also did not show how
her action in leaving a firearm unattended in a classroom was the functional
equivalent of having a firearm stolen from a vehicle (e.g., did the Lieutenant
leave the firearm in a position so that persons could see it from outside the
vehicle and/or fail to lock the vehicle and did Defendants' policies prohibit
storage of firearms in vehicles).  (See id.)  As a final matter, Plaintiff's
statement that "[a]ll inspectors and DMV personnel leave either their shotguns
or handguns on the tables near the range during firearms qualifications" does not
address whether such firearms were left unattended.  (Id.)

including dismissal.'" (<u>Id.</u> at Rikard Aff., ¶ 7.) "On May 28, 2009, [Plaintiff] was unable to locate one of her License and Theft Identification badges." (<u>Id.</u> at Rikard Aff., ¶ 8.)[16] Under Defendants' policies, employees are "'responsible for the care and security of all equipment issued to them . . . .'" (<u>Id.</u> at Rikard Aff., ¶ 9.) "Based upon these two infractions, [Plaintiff's supervisor in Winston-Salem] issued a written warning to [Plaintiff] dated June 11, 2009." (<u>Id.</u>; <u>see also id.</u> at Ex. L.)

"In June 2009[, Commissioner Robertson] was briefed on the fact that [Plaintiff] had recently rated her Inspectors 'unsatisfactory' for temporary evidence storage because it was her understanding that District V did not have evidence storage. Because [he] knew that every District had evidence storage, [Commissioner Robertson] decided to personally conduct a pre-disciplinary conference . . . ." (<u>Id.</u> at Robertson Aff., ¶ 6.) "During the conference, [Plaintiff] again stated that she did not know about evidence lockers." (<u>Id.</u> at Robertson Aff., ¶ 7.)

Commissioner Robertson "turned the recording of the pre-disciplinary conference over to [Ronald Kaylor, who had become Director of the License and Theft Bureau on June 18, 2009,] for him to take appropriate disciplinary action." (<u>Id.</u> at Robertson Aff., ¶ 8; <u>see also id.</u> at Kaylor Aff., ¶¶ 1, 4-5.) Director Kaylor "listened to the recording [and] . . . reviewed Plaintiff's personnel file, her training records and the Internal Investigation

---

[16] Plaintiff apparently left the badge in her office in Greensboro. (<u>See</u> Docket Entry 22 at Ex. L; Docket Entry 26-2 at 7.)

regarding the sexual harassment allegations. [He] also spoke with Plaintiff's Supervisors." (Id. at Kaylor Aff., ¶¶ 5-6.) Based on that review, Director Kaylor reported a number of concerns including "that Plaintiff had two prior written warnings" (i.e., "for leaving her weapon unattended" and for "falsification of a time sheet"). (Id. at Kaylor Aff., ¶¶ 3, 6.)

According to Director Kaylor, Plaintiff's claimed lack of knowledge of the existence of evidence storage facilities in her office caused him particular alarm:

> 7.  In reviewing all of the information available to me, I learned that [Plaintiff] had been appointed the District V Evidence Custodian on March 23, 2009, two months prior to the quarterly inspections. At the time she was appointed evidence custodian, [Plaintiff] entered the evidence closet, observed each package of evidence as it was being checked by the former evidence custodian, and she signed the evidence log sheet indicating the transfer of responsibility.
>
> 8.  The District V Evidence Log further reflects entries from [Plaintiff] on June 2, 2009 ("all evidence inventory"), June 4, 2009 ("Hunt going out for surgery"), and June 22, 2009 ("complete destruction order paperwork").
>
> 9.  I also noted that on November 30, 2007 [Plaintiff] had attended training on Evidence Procedures and Temporary Storage Lockers. Part of the training consisted of a powerpoint presentation outlining License and Theft Bureau Directive 4.06 regarding evidence control and storage. [Plaintiff] was also provided a three-page Memorandum that provided specific details about the Bureau's policy.
>
> 10. I conducted a second pre-disciplinary conference with Plaintiff on July 13, 2009. Supervisor Rikard was present at that pre-disciplinary conference. During the conference, [Plaintiff] again stated that she did not know where storage lockers were located in the evidence room. [Plaintiff] said that when the responsibility for evidence was

transferred to her, she was standing "here" (about feet [sic] away from the door of the evidence closet) and that she could not see inside at that time. As I opened the door, [Plaintiff] admitted that she could, in fact, see the evidence lockers.

11. It simply was not credible for [Plaintiff] to assert, "I didn't realize there were evidence lockers inside the closet door." Because truthfulness is the most critical aspect of an officer's reputation with both the public and the court system, the License and Theft Bureau takes an officer's veracity very seriously.

(Id. at Kaylor Aff., ¶¶ 7-11 (internal citations omitted).)[17]

Director Kaylor also focused on Plaintiff's failure to maintain a professional attitude and demeanor, including with him:

12. During the conference, Plaintiff told me, "I'm not going to remain the primary evidence custodian. If I'm responsible for everything in that safe and other people go into the safe without letting me know, then I'm not going to be responsible. You tell me that I will not be held liable if something comes up missing and I will stay evidence tech." I advised Plaintiff that she would not dictate to me what she was or was not going to do.

13. In discussing whether a key to the evidence closet was missing, Supervisor Rikard told Plaintiff that she was not aware of any lost keys. Plaintiff then called Supervisor Rikard a liar, and Plaintiff told me that she would go take a polygraph and I would see who the liar was. Plaintiff then asked Supervisor Rikard, "Why are you looking at me that way? You don't intimidate me."

14. Plaintiff's outburst demonstrated to me that she "did not have the ability to maintain a professional and productive working relationship with her supervisors and other members of the License and Theft Bureau."

15. [Plaintiff] has a demonstrated history in [sic] inappropriate behavior, including walking away from

---

[17] In her affidavit, Plaintiff did not contradict Director Kaylor's foregoing account of their interaction on July 13, 2009. (See Docket Entry 26-2.)

> her immediate Supervisor mid-sentence, calling her
> Supervisor a liar, talking over her Supervisors,
> talking down to her subordinates, not listening to
> what her colleagues are saying, becoming agitated
> when asked to perform certain duties, reporting to
> work in her personal vehicle without her police
> badge and gun, and placing herself on light duty
> without permission.

(<u>Id.</u> at Kaylor Aff., ¶¶ 12-15 (internal brackets and citations

omitted).)[18]

On July 16, 2009, Director Kaylor informed Plaintiff of her

firing in a four-plus page letter with this summary of his reasons:

> I have decided to dismiss you for <u>unsatisfactory job
> performance</u> and unacceptable personal conduct. The
> specific issues that represent the basis for this
> decision are:
>
> 1. Inefficient performance of duties;
> 2. Inability to perform duties;
> 3. Failure to maintain a professional and
>    productive working relationship with
>    subordinate employees and other members of the
>    License and Theft Bureau; and
> 4. Failure to answer inquiries truthfully during
>    the initial Pre-Disciplinary Conference on
>    June 30, 2009.

(Docket Entry 22 at Ex. O, p. 1 (emphasis added).)

<u>DISCUSSION</u>

<u>Summary Judgment Standard</u>

"Summary judgment is appropriate when 'the pleadings,

depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no genuine

issue as to any material fact and that the moving party is entitled

to a judgment as a matter of law.'" <u>Emmett v. Johnson</u>, 532 F.3d

---

[18] In her affidavit, Plaintiff did not contradict Director Kaylor's
foregoing account of their interaction on July 13, 2009. (<u>See</u> Docket Entry 26-2.)

291, 297 (4th Cir. 2008) (quoting Fed. R. Civ. P. 56(c)).  In making this determination, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 150 (2000).  <u>Accord Matvia v. Bald Head Island Mgt., Inc.</u>, 259 F.3d 261, 266 (4th Cir. 2001) ("The court must consider the evidence in the light most favorable to the non-moving party and draw all reasonable inferences from the facts in the non-movant's favor.").

"[T]here is no burden upon 'the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact.'  Rather, 'the burden on the moving party may be discharged by "showing" – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case.'" <u>Carr v. Deeds</u>, 453 F.3d 593, 608 (4th Cir. 2006) (quoting <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986)) (internal emphasis omitted).  Conversely, "[t]he party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of his pleading, but 'must come forward with specific facts showing that there is a genuine issue for trial.'" <u>Emmett</u>, 532 F.3d at 297 (quoting <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986)). <u>See also</u> <u>Francis v. Booz, Allen & Hamilton, Inc.</u>, 452 F.3d 299, 308 (4th Cir. 2006) ("Mere unsupported speculation is not sufficient to defeat a summary judgment motion if the undisputed evidence indicates that the other party should win as a matter of law.").

## Sex-Based Discrimination via Hostile Work Environment

According to the Complaint, "Plaintiff was routinely subjected to sexual harassment by her then supervisor, [Captain] Blake." (Docket Entry 1 at 4.) To make out a claim of sex-based discrimination in the form of a hostile work environment, Plaintiff must present evidence of a "'workplace permeated with discriminatory [e.g., sex-based] intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Jordan v. Alternative Res. Corp., 458 F.3d 332, 339 (4th Cir. 2006) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)). "'[S]imple teasing, off-hand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.'" Id. (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998)). The conduct ascribed to Captain Blake by Plaintiff (detailed in the Factual Background section) simply does not rise to a level that would allow a reasonable fact-finder to conclude that she suffered sex-based "intimidation, ridicule, and insult that [wa]s sufficiently severe or pervasive to alter the conditions of [her] employment," id. (internal quotation marks omitted).

The bulk of the behaviors Plaintiff has cited as evidence of a hostile work environment have no apparent connection to gender beyond the fact that Plaintiff is a female and Captain Blake is a

male.[19]  The Fourth Circuit has held that complaints of this sort (i.e., objections by an employee from one demographic group to the supervision practices of a manager from a different demographic group) fail to support a hostile work environment claim.  See Hawkins v. Pepsico, Inc., 203 F.3d 274, 281-82 (4th Cir. 2000) (affirming summary judgment for employer on African-American employee's race-based hostile work environment claim, where employee complained "she had received inadequate coaching, had to do work over and over, was unreasonably required to work late the night of an office Christmas party, and did not have access to the same work opportunities as other managers," because such "complaints about [her white supervisor's] management style toward her [we]re without a hint of racial significance" and stating that the "difficulties that [the plaintiff] encountered with [her supervisor] arise routinely in employment relationships . . . [and that the] [l]aw does not blindly ascribe to race all personal conflicts between individuals of different races").

The few remarks Plaintiff attributes to Captain Blake that arguably have a sex-based tone (i.e., his statement that Plaintiff reminded him of an ex-wife, his comment that females (including all but one of his daughters) "generally do not have their heads on straight," his questioning of the ability of two "ranking" female

---

[19] For example, Plaintiff objected that Captain Blake corrected her work, caused her to work through lunch or after she planned to leave, directed her to complete tasks, second-guessed her decisions, failed to consult her, told her to calm down, interpreted rules in a manner with which she disagreed, had certain overflow work directed to him, made inquiries she deemed meddlesome, and required her to report her whereabouts.  (See Docket Entry 26-2 at 2-4, 15, 17-22.)

employees, his praise for a male employee's competence in comparison to Plaintiff, and his musing to an Inspector (apparently within Plaintiff's earshot) that he liked "[y]oung women and long legged women," <u>see</u> Docket Entry 26-2 at 2-3, 18-19) fall well within the realm of "'simple teasing, off-hand comments, and isolated incidents . . . [that] will not amount to discriminatory changes in the terms and conditions of employment,'" <u>Jordan</u>, 458 F.3d at 339 (quoting <u>Faragher</u>, 524 U.S. at 788).[20]

Beyond the foregoing complaints, Plaintiff points to three matters involving the way Captain Blake looked at her:

1) "[o]n October 16, 2008, [Plaintiff] noticed that on several occasions after ending a conversation with Blake and other subordinates, the subordinates would look at Blake and laugh as [Plaintiff] walked away . . . [and Plaintiff] was told that Blake

---

[20] The decision in <u>Hartsell v. Duplex Prods., Inc.</u>, 123 F.3d 766 (4th Cir. 1997), confirms this conclusion. In said case, the plaintiff complained of:

> [the] statement, "We've made every female in this office cry like a baby"; [a] comment upon seeing a buxom woman in the company magazine [i.e., "why don't we have sales assistants that look like that"]; . . . [a] question . . . as to whether [a female employee] would be a "mini van driving mommy" or "be a salesperson and play with the big boys"; and [a] statement that [the plaintiff] should "go home and fetch [her] husband's slippers like a good little wife."

<u>Id.</u> at 773 (internal footnote omitted). The Fourth Circuit held that "allowing [such a hostile work environment] claim to go to trial would countenance a federal cause of action for mere unpleasantness. Title VII is not a federal guarantee of refinement and sophistication in the workplace – in this context, it prohibits only harassing behavior that is so severe or pervasive as to render the workplace objectively hostile or abusive." <u>Id.</u>; <u>see also id.</u> ("[T]he claims propounded by the plaintiff . . . are so trivial, so isolated, and so far from the paradigmatic case of sexual harassment, that summary judgment was clearly appropriate."). The five above-quoted remarks attributed to Captain Blake by Plaintiff created no more negative environment for women than the commentary at issue in <u>Hartsell</u> and thus they fail to support a hostile work environment claim.

often watched [her] rear end as [she] walked away from him at the conclusion of conversations with him" (Docket Entry 26-2 at 2);

2) on December 11, 2008, Plaintiff "noticed Captain Blake ogling at [her] as [she] walked away" (id. at 19); and

3) "[o]n February 11, 2009, Blake and [Plaintiff] were having a conversation in Blake's office when Blake told [Plaintiff] to sit up while [she] was sitting in the chair in front of his desk . . . [with her] legs crossed and [her] arms . . . folded over [her] chest area because Blake was staring at [her] breasts" (id. at 4).

As to the first of these incidents, Plaintiff has failed to identify any admissible evidence to support a finding that Captain Blake "often watched [her] rear end" (id. at 2); accordingly, she cannot avoid summary judgment by relying on this allegation. See, e.g., Maryland Highways Contractors Ass'n, Inc. v. State of Md., 933 F.2d 1246, 1251 (4th Cir. 1991) ("[S]everal circuits, including the Fourth Circuit, have stated that hearsay evidence, which is inadmissible at trial, cannot be considered on a motion for summary judgment."). As to the other two incidents, the Fourth Circuit has held similar, but substantially more sexually-aggressive behavior insufficient to sustain a hostile work environment claim; for example, in Singleton v. Department of Corr. Educ., 115 Fed. Appx. 119 (4th Cir. 2004), a supervisory-level employee:

> insistently complimented [the plaintiff]; stared at her breasts when he spoke to her; on one occasion, he measured the length of her skirt to judge its compliance with the prison's dress code and told her that it looked "real good"; constantly told her how attractive he found her; made references to his physical fitness, considering his advanced age; asked [the plaintiff] if he made her

nervous (she answered "yes"); and repeatedly remarked to
[her] that if he had a wife as attractive as [the
plaintiff], he would not permit her to work in a prison
facility around so many inmates.

Id. at 120 (emphasis added).

The Fourth Circuit found that, although the evidence established that a supervisor "made offensive comments, showed [the plaintiff] unwanted attention that made her uncomfortable, and continuously expressed a sexual interest in her[, the plaintiff] d[id] not meet the high standard set forth under Title VII." Id. at 122. Instead, it held that such conduct, "though boorish and offensive, is more comparable to the kind of rude behavior, teasing, and offhand comments that [is] not sufficiently severe and pervasive to constitute actionable sexual harassment." Id. By that standard, two isolated incidents of Captain Blake "ogling at" Plaintiff and "staring at [her] breasts" (Docket Entry 26-2 at 4, 19) will not support a hostile work environment claim.[21]

Under these circumstances, the Court should grant summary judgment for Defendants as to Plaintiff's Title VII claim for sex-based discrimination in the form of a hostile work environment.

<u>Sex- and Race-Based Discrimination via
Disparate Treatment by Captain Blake</u>

As noted above in the Procedural Background section, the Complaint alleges that Defendants "subjected [Plaintiff] to

---

[21] Other district courts in the Fourth Circuit have looked to Singleton in rejecting hostile work environment claims on the grounds that workplace conduct more significant than that identified in this case lacked sufficient severity and pervasiveness. See, e.g., Moret v. Geren, 494 F. Supp. 2d 329, 342-43 (D. Md. 2007); Byers v. HSBC Fin. Corp., 416 F. Supp. 2d 424, 433-36 (E.D. Va. 2006).

disparate treatment due to her race and gender, in terms of the
work conditions, privileges, benefits, and work environment . . .
[and violated] Title VII [by subjecting Plaintiff to] disparate
treatment, discrimination and wrongful discharge." (Docket Entry 1
at 3 (emphasis added).)  Although the Complaint does not clearly
identify any such "disparate treatment" at that point, it does
differentiate "disparate treatment" from "wrongful discharge."
(See id.)  In addition, at a later point, the Complaint asserts
that "Blake scrutinized [Plaintiff's] work and the manner in which
she supervised her staff differently and harsher than he
scrutinized the Plaintiff's male coworkers . . . [and] issued
discipline to her for minor and unsubstantiated infractions, but
overlooked similar conduct by the Plaintiff's male co-workers."
(Id. at 4 (emphasis added).)  The Complaint, however, contains no
factual allegations suggesting that Captain Blake treated Plaintiff
differently from anyone based on race.  (See id. at 1-8.)

     To the extent Plaintiff alleges sex- and race-based employment
discrimination in the form of disparate treatment by Captain Blake,
she may proceed "in one of two ways.  First, [s]he may present
direct evidence of h[er] superiors' discriminatory intent.  Second,
[s]he may attempt to satisfy the test specified in McDonnell
Douglas Corp. v. Green, 411 U.S. 792, 802 (1973), which allows
h[er] to raise an inference of discriminatory intent by showing
that [s]he was treated worse than similarly situated employees of
other [genders and races]."  Sterling v. Tenet, 416 F.3d 338, 345
(2005) (internal parallel citations omitted).

It does not appear that Plaintiff could show sex- or race-based animus by Captain Blake under either the direct or indirect methods of proof; however, the Court need not undertake such analysis because, "[r]egardless of the route a plaintiff follows in proving a Title VII [discrimination] action, the existence of some adverse employment action is required." James v. Booz-Allen & Hamilton, Inc., 368 F.3d 371, 375 (4th Cir. 2004) (internal citation and footnote omitted) (emphasis added). As the analysis of the record in the Factual Background section shows, Plaintiff has failed to provide an evidentiary basis for a reasonable fact-finder to conclude that she suffered an "adverse employment action" while under Captain Blake's supervision.[22] Thus, to the extent Plaintiff has asserted a Title VII claim of sex- and/or race-based discrimination due to disparate treatment by Captain Blake, the Court should award summary judgment to Defendants.

## Retaliation by Transfer to Winston-Salem

Plaintiff's Complaint alleges that, as a consequence of her internal complaint regarding Captain Blake's creation of a hostile work environment, Defendants retaliated against her by ordering her transfer from Greensboro to Winston-Salem. (See Docket Entry 1 at

---

[22] At most, Plaintiff has shown that Captain Blake subjected her to "counseling" about various matters. (See Docket Entry 26-2 at 3, 21.) However, events, such as "reprimands . . ., meetings with supervisors, and directions to attend counseling, do not constitute adverse employment actions." Prince-Garrison v. Maryland Dep't of Health and Mental Hygiene, 317 Fed. Appx. 351, 353 (4th Cir. 2009) (citing Thompson v. Potomac Elec. Power Co., 312 F.3d 645, 651-52 (4th Cir. 2002)). Accord Newby v. Whitman, 340 F. Supp. 2d 637, 664 (M.D.N.C. 2004) (Beaty, J.) (granting summary judgment for employer where employee failed to present "evidence that the reprimand he received had any formal or tangible impact on the terms or conditions of [his] employment").

4.)  Defendants have moved for summary judgment on the ground that said transfer cannot support a retaliation claim under Title VII. (See Docket Entry 22 at 14.)  They should prevail on that argument.

"The [Title VII] antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." Burlington N. and Santa Fe Ry. Co. v. White, 548 U.S. 53, 67 (2006).  To meet this standard, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Id. at 68 (internal quotation marks omitted) (emphasis added).[23]  The requirement of "material adversity" serves "to separate significant from trivial harms." Id.  Courts applying the foregoing standard from White have concluded that transfers resulting in modest increases in an employee's commute (such as the approximately 30-minute travel time between Greensboro and Winston-Salem) fail to qualify as materially adverse actions. See Johnson v. TCB Constr. Co., Inc., 334 Fed. Appx. 666, 671-72 (5th Cir. 2009); Richards-Byers v. New York City Dep't of Fin., No. 05CV8486(GBD), 2010 WL 2834893, at *6 (S.D.N.Y. July 7, 2010) (unpublished); Witkowich v. Holder, No. 05CIV7756(GBD), 2010 WL 1328364, at *4 (S.D.N.Y. Mar. 31, 2010)

---

[23] The "materially adverse action" standard applicable to Title VII retaliation claims differs from the "adverse employment action" requirement applicable to Title VII discrimination claims. See Caldwell v. Johnson, 289 Fed. Appx. 579, 588 (4th Cir. 2008) (observing that White "noted meaningful differences in the anti-discrimination and anti-retaliation statutes that provided recovery for a far broader range of retaliatory conduct").

(unpublished); Everson v. New York City Transit. Auth., No. 1:02CV1121-ENV-JMA, 2007 WL 539159, at *30-31 (E.D.N.Y. Feb. 16, 2007) (unpublished); Sibilia v. Snow, Civil Action No. 05-10096, 2006 WL 2990479, at *7 (D. Mass. Oct. 20, 2006) (unpublished).

Alternatively, Plaintiff has failed to present sufficient evidence to allow a reasonable fact-finder to determine that Defendants acted with intent to retaliate when they transferred her to Winston-Salem. Plaintiff has offered no direct evidence of retaliatory intent and thus she may survive summary judgment only if she can raise a material question of fact under the McDonnell Douglas burden-shifting proof-scheme. See Price v. Thompson, 380 F.3d 209, 212 (4th Cir. 2004). Under that approach:

> [T]he plaintiff must first establish a prima facie case of retaliation, whereupon the burden shifts to the employer to establish a legitimate non-retaliatory reason for the action. If the employer sets forth a legitimate, non-retaliatory explanation for the action, the plaintiff then must show that the employer's proffered reasons are pretextual or his claim will fail. More specifically, the plaintiff can prove pretext by showing that the explanation is unworthy of credence or by offering other forms of circumstantial evidence sufficiently probative of retaliation.

Id. (internal brackets and quotation marks omitted).

In this case, assuming that Plaintiff could make out a prima facie case of retaliation as to her transfer, Defendants have rebutted that showing by presenting a non-retaliatory rationale for their action. Specifically, as documented above in the Factual Background section, Defendants have produced evidence that:

1) when Plaintiff made an internal complaint about Captain Blake, she requested a transfer away from Greensboro;

-35-

2) while an internal investigation occurred, Defendants gave Plaintiff more than she asked for, in that they transferred Captain Blake away from Greensboro and allowed Plaintiff to remain there;

3) when the internal investigation exonerated Captain Blake, Plaintiff, through a State Senator, expressed continuing concern about working in the same office with Captain Blake; and

4) Defendants accommodated Plaintiff's concern by granting her original request for a transfer away from Greensboro, before allowing Captain Blake to return there.

Plaintiff, in turn, has failed to identify evidence that would allow a reasonable fact-finder to reject Defendants' foregoing, innocent explanation of the transfer. More specifically, Plaintiff has not cited record material "showing that [Defendants'] explanation is unworthy of credence or . . . offer[ed] other forms of circumstantial evidence sufficiently probative of retaliation." Id. (internal brackets and quotation marks omitted). See also Collier v. Charlottesville Sch. Bd., 218 Fed. Appx. 244, 245 (4th Cir. 2007) ("[U]nsubstantiated assertions as to pretext . . . [cannot] stave off summary judgment."); Newby v. Whitman, 340 F. Supp. 2d 637, 662 (M.D.N.C. 2004) (Beaty, J.) ("Plaintiff cannot create a genuine issue of material fact by simply contending that Defendant must be lying as to the reason for [the adverse action], without presenting any evidence or basis for that claim.").

As a result, the Court should grant summary judgment to Defendants on Plaintiff's Title VII claim of retaliation in connection with her transfer to Winston-Salem.

<u>Sex- and Race-Based Discrimination as to Suspension and Firing</u>

According to Plaintiff's Complaint, Defendants' decisions to suspend her for three days without pay for leaving her firearm unattended (Docket Entry 26-2 at 25-26) and, later, to terminate her employment for "unsatisfactory job performance and unacceptable personal conduct" (Docket Entry 22 at Ex. O, p. 1), both constituted acts of sex- and race-based discrimination. (<u>See</u> Docket Entry 1 at 5-6.) In moving for summary judgment, Defendants argued that Plaintiff's failure to exhaust her administrative remedies as to such claims before filing her Complaint in this case forecloses relief under Title VII. (<u>See</u> Docket Entry 22 at 15, 16.) This argument has merit.

As the Fourth Circuit recently reiterated: "'Only those discrimination claims stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint may be maintained in a subsequent Title VII lawsuit.'" <u>Jones</u>, 551 F.3d at 300 (quoting <u>Evans v. Technologies Applications & Serv. Co.</u>, 80 F.3d 954, 963 (4th Cir. 1996)). Plaintiff's claims of sex- and race-based discrimination predicated on her suspension and her firing: 1) were not "stated in [her] initial [or amended] charge" (<u>id.</u>); 2) are not "reasonably related to the original [or amended] complaint" (<u>id.</u>); and 3) were not "developed by reasonable investigation of the original [or amended] complaint" (<u>id.</u>). <u>See, e.g.</u>, <u>Chacko v. Patuxent Inst.</u>, 429 F.3d 505, 506 (4th Cir. 2005) ("A plaintiff fails to exhaust his administrative remedies where,

-37-

as here, his administrative charges reference different time frames, actors, and discriminatory conduct than the central factual allegations in his formal suit.").

In responding to Defendants' argument on this point, Plaintiff did not deny that she failed to exhaust administrative remedies as to her claims of sex- and race-based discrimination arising from her suspension and her firing.  Nor did Plaintiff dispute the notion that such failure generally would preclude her from litigating those claims under Title VII.  (See Docket Entry 26 at 15.)  Instead, "[b]ased on [Defendants'] previous representations to the OAH [North Carolina's Office of Administrative Hearings], [Plaintiff] contend[ed] that [Defendants] voluntarily waived any jurisdictional challenges related to the claims raised in this lawsuit in the essence of judicial economy."  (Id.)

Plaintiff's brief fails to identify with any specificity what "representations" Defendants made to "waive" the effect of her failure to exhaust these claims administratively.  (See id.) Rather, Plaintiff's summary judgment brief offers only a generic citation to "Exhibit E" (id.), an apparent reference to a group of documents Plaintiff attached to a filing she made contemporaneously with her brief (see Docket Entry 25-5).  Said Exhibit E (entitled "Office of Administrative Hearing Documents") contains only one item bearing "representations" by Defendants:  a "Motion for Stay of Proceedings" filed by Defendants as to Plaintiff's two consolidated, state administrative cases.  (Id. at 8-12.)  Said "representations" consist of the following:

1) a recitation of the dates of Plaintiff's EEOC charge(s) against Defendants, the EEOC's right to sue letter, Plaintiff's Complaint in this case, and Defendants' Answer thereto (id. at 8);

2) a report that, on August 9, 2009, Plaintiff filed an administrative case with the OAH regarding her firing, that, on September 16, 2009, the OAH consolidated that case with Plaintiff's previously-filed OAH case,[24] and that, as of October 9, 2009, the OAH "ha[d] not issued a dispositive ruling on either of the consolidated cases" (id.); and

3) a claim that, because Plaintiff's OAH cases and her instant case "both involve claims that [her] termination was illegal and discriminatory," the OAH cases should "be stayed pending resolution of th[e] federal suit," in light of state law providing for stays under such circumstances and the need to avoid "premature and potentially duplicative [proceedings]" (id. at 9-10).

Plaintiff has not developed any argument or cited any authority to support her conclusory assertion that, by seeking a stay of OAH proceedings on the ground that Plaintiff had raised overlapping claims in this case, Defendants waived the dispositive effect of Plaintiff's failure to exhaust her administrative remedies before instituting the instant action. Nor would it appear that Defendants' conduct could alter the consequences of such non-exhaustion, given that the Fourth Circuit has made it clear that "a failure by the plaintiff to exhaust administrative

_____

[24] It appears Plaintiff instituted the first OAH case on May 15, 2009. (See Docket Entry 1 at 4; Docket Entry 25-5 at 2.)

-39-

remedies concerning a Title VII claim deprives the federal courts of <u>subject matter jurisdiction</u> over the claim," <u>Jones</u>, 551 F.3d at 300 (emphasis added).  <u>See, e.g.</u>, <u>In re Kirkland</u>, 600 F.3d 310, 314 (4th Cir. 2010) ("Subject matter jurisdiction cannot be forfeited or waived, and can be raised by a party, or by the court *sua sponte*, at any time prior to final judgment.").

Accordingly, the Court should dismiss for lack of subject matter jurisdiction Plaintiff's Title VII claims of sex- and race-based discrimination as to her suspension and firing.  <u>See Jones</u>, 551 F.3d at 301 ("Because [the plaintiff's] failure to exhaust administrative remedies deprived the district court of subject matter jurisdiction over the claims, the only function remaining to the court was that of announcing the fact and dismissing the causes." (internal brackets and quotation marks omitted)).

Retaliation as to Suspension and Firing

Plaintiff's Complaint also alleges that her three-day suspension and her firing qualified as unlawful retaliation.  (<u>See</u> Docket Entry 1 at 5-6.)  According to Defendants, Plaintiff's failure to present these claims to the EEOC precludes relief under Title VII.  (<u>See</u> Docket Entry 22 at 15, 16.)  As noted above: "'Only those discrimination claims stated in the initial charge, those <u>reasonably related to the original complaint</u>, and those developed by reasonable investigation of the original complaint may be maintained in a subsequent Title VII lawsuit.'" <u>Jones</u>, 551 F.3d at 300 (quoting <u>Evans</u>, 80 F.3d at 963) (emphasis added).  However, the Fourth Circuit has held that where, as here, a plaintiff has

alleged continuing retaliation in a prior administrative charge, additional claims of retaliation are "reasonably related to the allegations of the [prior] charge." Id. at 304. Accordingly, the Court possesses subject matter jurisdiction over Plaintiff's Title VII retaliation claims as to her suspension and her firing.[25]

As with her retaliation claim related to her transfer to Winston-Salem, Plaintiff has presented no direct evidence that Defendants acted with retaliatory intent when they suspended her for leaving her firearm unattended and/or when they fired her. To avoid summary judgment on these claims, Plaintiff therefore must demonstrate the existence of a material question of fact via the indirect method of proof recognized in McDonnell Douglas and its progeny. See Price, 380 F.3d at 212. She has not.

First, as to her suspension, even if the Court credited Plaintiff with establishing a prima facie case of retaliation, her claim still fails as a matter of law because Defendants proffered a non-retaliatory reason for the suspension and Plaintiff failed to identify evidence that would allow a reasonable fact-finder to reject Defendants' justification. As set forth in the Factual Background section, Defendants have produced evidence that Plaintiff received the suspension in question because of her violation of a clear work-place policy and that said suspension

---

[25] Defendants' citation of Amtrak v. Morgan, 536 U.S. 101, 113 (2002), does not alter this view. The Fourth Circuit has determined that "Morgan addresses only the issue of when the limitations clock for filing an EEOC charge begins ticking with regard to discrete unlawful employment practices. . . . It does not purport to address the extent to which an EEOC charge satisfies exhaustion requirements for claims of related, post-charge events." Jones, 551 F.3d at 303.

matched the punishment imposed on others who committed such infractions. Plaintiff therefore had the burden of presenting evidence that would call into question Defendants' showing.

In her summary judgment brief, Plaintiff attempted to meet the obligation by asserting that "the policy [regarding control of firearms] was relaxed [during training courses] and the employees were allowed to leave their weapons while taking short breaks." (Docket Entry 26 at 12.) As evidentiary support for this assertion, Plaintiff cited "Exhibit F." (Id.) The undersigned Magistrate Judge could not locate an "Exhibit F" attached to either Plaintiff's summary judgment response (Docket Entry 25) or her brief (Docket Entry 26); however, said citation may refer to an affidavit of Richard Hopkins, identified therein as a former Inspector with Defendant NCDMV. (Docket Entry 26-3.)

According to Mr. Hopkins, he "personally left [his] weapon in a classroom while [he] took a restroom break during training and ha[s] seen other officers do the same without being disciplined or accused of violating policy." (Id. at 2.) Said affidavit provides no basis to infer that Mr. Hopkins would have had personal knowledge of any discipline imposed upon persons other than himself (i.e., Mr. Hopkins did not aver that he held a position that exposed him to personnel information of Defendants' employees). Further, Mr. Hopkins's affidavit offers no evidence that Defendants (or employees of Defendants responsible for enforcing the firearm control policy) had any knowledge of the firearm-handling practices Mr. Hopkins attributed to himself and others. Finally, Mr.

Hopkins's affidavit fails to address the fact that, according to undisputed evidence from the instructor in the classroom where Plaintiff left her firearm, persons undergoing training may leave their firearms in classrooms, if they ask the instructor to secure the firearm for them and "if the instructor remains in the classroom, securing the weapon thereby. This was not the case when [Plaintiff] abandoned her weapon in the classroom on March 26, 2009." (Docket Entry 28 at King Aff., ¶ 6.)

Under these circumstances, Mr. Hopkins's affidavit fails to create a material question of fact as to whether Defendants' explanation of Plaintiff's suspension constituted mere pretext for retaliation. Given the absence of any other probative evidence on this point,[26] the Court should grant Defendants summary judgment on Plaintiff's Title VII retaliation claim as to her suspension.

Plaintiff's retaliation claim regarding her firing similarly falls short. Again, assuming Plaintiff could establish a prima facie case, she has failed to present proof sufficient to permit a reasonable fact-finder to reject Defendants' proffered, non-retaliatory reasons for terminating her employment. As detailed above in the Factual Background section, at the time of her firing, Defendants documented clear deficiencies in Plaintiff's performance of her job duties and in her behavior. According to Plaintiff, she sufficiently "rebut[ted] [D]efendants' reasons for her termination,

---

[26] For reasons described above in the Factual Background section, Plaintiff's own affidavit contains no evidence that other employees of Defendants who left firearms unattended during training failed to receive discipline.

[by] alleging that even if believed, they *were* *all* *subjective* *and unrelated to the qualifications* necessary to perform her position." (Docket Entry 26 at 16 (italics in original) (underlining added).)

Defendants' reasons for Plaintiff's firing included, inter alia, that:

1) in trying to justify an erroneous evaluation of an inspector (first to the head of Defendant NCDMV and then to the state-wide director of the Bureau in which she worked), Plaintiff falsely denied knowledge that her office had evidence storage despite the fact that she served as the evidence custodian, had seen the evidence storage lockers, and had signed off on stored evidence (see Docket Entry 22 at Ex. O, pp. 1-2); and

2) in a meeting with said state-wide director, Plaintiff attempted to dictate to him the conditions under which she would perform the duties of her job, called her supervisor in Winston-Salem a liar, and otherwise failed to conduct herself in a professional manner (see id. at Ex. O, pp. 4.)

Contrary to Plaintiff's suggestion, truthfulness and respect for authority are not matters "unrelated to the qualifications necessary to perform her position" (Docket Entry 26 at 16 (internal emphasis omitted)).[27] Nor has Plaintiff cited any authority to support her apparent view that she can raise a material question of fact as to pretext simply by labeling Defendants' determinations as

---

[27] Indeed, Defendants' termination letter explicitly showed, by reference to established organizational policy, how such matters related to Plaintiff's job and why her failure to meet such expectations warranted her firing. (See Docket Entry 22 at Ex. O, pp. 3, 4.)

to her performance "subjective." Such an approach would conflict with controlling authority dictating that, "when an employer gives a legitimate, non-discriminatory reason for discharging the plaintiff, it is not [the court's] province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." Hawkins, 203 F.3d at 279 (internal quotation marks omitted).

Given these considerations, the Court should grant summary judgment for Defendants on the instant Title VII retaliation claim because Plaintiff has failed to identify evidence that called into question the genuineness of Defendants' explanation of their decision to fire her or otherwise showed that retaliation represented their true motive. See Price, 380 F.3d at 212.

### Motions to Strike

Each side has moved to strike portions of affidavits filed by the other. (Docket Entries 27, 30.) Plaintiff seeks an order striking various statements in the affidavits of Captain Blake, Graham F. Butler (a supervisory official in the License and Theft Bureau), Director Kaylor, and Rena Rikard (Plaintiff's supervisor in Winston-Salem) on the ground that such statements fail to satisfy the requirements of Federal Rule of Civil Procedure 56(e). (See Docket Entry 27 at 1-5.) As the record citations set out in prior sections of this Memorandum Opinion reflect, in evaluating Defendants' summary judgment motion, the undersigned Magistrate Judge took note of only two of the averments Plaintiff challenges:

1) Director Kaylor's report that he "listened to the recording of the June 30, 2009 pre-disciplinary conference [Commissioner Robertson had with Plaintiff] . . . [and that Plaintiff] again stated that she did not know about evidence lockers" (Docket Entry 22 at Kaylor Aff., ¶ 5; see also Docket Entry 27 at 3); and

2) Director Kaylor's averment that, after reviewing various materials (including Plaintiff's personnel file), he "was deeply troubled that [she] had two prior written warnings" (Docket Entry 22 at Kaylor Aff., ¶ 6; see also Docket Entry 27 at 4).[28]

Plaintiff appears to object to the former statement because Director Kaylor "did not provide the recording or any transcription therefrom" and to the latter averment because it is "clearly based on hearsay testimony that would be inadmissible." (Docket Entry 27 at 3-4.) Plaintiff offers no argument or authority to support these objections. (See id.) Nor does the undersigned Magistrate Judge view the challenged statements as inadmissible in the context of the instant summary judgment litigation.

Director Kaylor's above-cited averments relate to Plaintiff's firing, which (according to Defendants) occurred due to Plaintiff's failure to meet their professional expectations and which (according to Plaintiff) occurred due to Defendants' desire to retaliate against her for complaining about unlawful discrimination. In support of their position that they fired Plaintiff based on her deficiencies as an employee, Defendants have

_____

[28] Because the other statements contested by Plaintiff have no bearing on the disposition of summary judgment, those aspects of her motion are moot.

offered Director Kaylor's testimony about how and why he decided to fire Plaintiff. As such, Director Kaylor's description of material he considered (including the recording of Plaintiff's conference with Commissioner Robertson and her personnel records showing two prior warnings) is not offered for the truth of such underlying matters, but rather to explain his action.[29] Plaintiff's instant evidentiary objections therefore lack merit. See, e.g., Pugh v. City of Attica, Ind., 259 F.3d 619, 627 n.7 (7th Cir. 2001).

Defendants, in turn, ask the Court (pursuant to Federal Rule of Civil Procedure 56(e)) to strike portions of Plaintiff's affidavit for lack of personal knowledge. (See Docket Entry 30 at 1-7.) Many of the challenged statements do appear to suffer from such a defect; however, the undersigned Magistrate Judge has addressed any such deficiencies, where relevant, within the analysis of the summary judgment issues (i.e., if – in her summary judgment brief – Plaintiff sought to establish the existence of a material question of fact by pointing to portions of her affidavit that lacked an adequate foundation, the Memorandum Opinion so notes and places no weight on the defective averment). Because entering an order formally striking portions of Plaintiff's affidavit would serve no additional purpose, Defendants' motion to strike is moot.

---

[29] In other words, to secure summary judgment, Defendants need not prove that Plaintiff, in fact, was an unsuitable employee (e.g., one who falsely denied knowledge of evidence storage in her office); instead, they need only produce evidence that they considered Plaintiff an unsuitable employee (e.g., because they believed she falsely denied knowledge of evidence storage in her office). See, e.g., Hawkins, 203 F.3d at 279.

<u>CONCLUSION</u>

Plaintiff has failed to carry her burden of identifying competent record evidence sufficient to raise a material question of fact as to any claim over which the Court has subject matter jurisdiction. The parties' respective motions to strike lack merit and/or have become moot.

**IT IS THEREFORE ORDERED** that Plaintiff's Motion to Strike Portions of the Affidavits of Norman J. Blake, Graham F. Butler, Ronald G. Kaylor and Rena Rikard (Docket Entry 27) and Defendants' Motion to Strike Portions of the Affidavit of the Plaintiff (Docket Entry 30) are **DENIED.**

**IT IS RECOMMENDED** that Defendant's Motion for Summary Judgment (Docket Entry 21) be **GRANTED**, but that, in disposing of Plaintiff's claims, the judgment reflect that Plaintiff's Title VII sex- and race-based discrimination claims as to her three-day suspension and her termination are dismissed for lack of subject matter jurisdiction, rather than on the merits.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

November 29, 2010